SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Mark Melvin (A-44-19) (083298)**
**State v. Michelle Paden-Battle (A-13-20) (084603)**

**Argued February 1, 2021 -- Decided September 23, 2021**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

One of the most important tenets of the criminal justice system is the finality of a jury's verdict of acquittal. These consolidated appeals test that principle through a common legal issue: whether a trial judge can consider at sentencing a defendant's alleged conduct for crimes for which a jury returned a not guilty verdict.

In State v. Melvin, Melvin was indicted on nine counts in connection with a fatal shooting in a restaurant, including charges of murder, aggravated assault, and weapon possession and drug offenses. At the conclusion of the trial, the jury found Melvin guilty of unlawful possession of a handgun but remained deadlocked on the outstanding counts.

With the discretion to sentence Melvin to an extended term of ten to twenty years, the trial court sentenced Melvin to the maximum, citing United States v. Watts, 519 U.S. 148 (1997), in his consideration of Melvin's conduct -- specifically, the evidence relating to the murder charges as to which the jury was hung. The sentencing judge determined that "by a preponderance of the credible evidence at trial, . . . Melvin did in fact use a firearm, which resulted in the death of [the two victims] and the injury to [the restaurant owner]."

The Appellate Division affirmed Melvin's conviction but remanded the matter for resentencing, holding that the sentencing judge incorrectly applied Watts . . . and that a judge cannot act as a "thirteenth juror" by "substitut[ing] his judgment for that of the jury." The court further noted that "[t]he judge abused his discretion by finding [Melvin] was the shooter by a preponderance of the evidence and considering that conduct in his sentencing decision." At the retrial of the deadlocked counts, Melvin was acquitted of murder and aggravated assault, and the State dismissed the drug charges. The same judge who presided over the first trial and sentencing handled Melvin's retrial and resentencing. The judge again cited Watts in his determination that "the evidence at the trial support[ed] a conclusion that [Melvin] was the shooter of the two individuals" at the restaurant, adding, contrary to the jury's verdict, that Melvin "not only . . . possess[ed] said weapon, but he used it to shoot upon three other human beings."

The trial court resentenced Melvin to an extended term, which the Appellate Division affirmed on appeal. The Court granted Melvin's petition for certification, "limited to the issue of whether the sentencing judge could consider defendant's conduct even though the jury acquitted defendant of the underlying crimes." 240 N.J. 549 (2020).

In State v. Paden-Battle, Paden-Battle was indicted in connection with the murder of Regina Baker for offenses including kidnapping, murder, felony murder, gang criminality, and weapons offenses. After a trial -- before the same judge who presided over Melvin's trials and sentencings -- the jury convicted Paden-Battle on the charges of kidnapping, conspiracy to commit kidnapping, and felony murder, and acquitted Paden-Battle of first-degree murder, conspiracy to commit murder, and both weapons offenses.

In sentencing Paden-Battle to sixty years' imprisonment, the judge noted that "Regina Baker would be alive today" if not for Paden-Battle, who, the court added, "was the mastermind" of Baker's kidnapping and execution. The court stated that Paden-Battle "was in charge" because, "[a]lthough she did not pull the trigger," the shooters "did so on her orders."

On appeal, the Appellate Division affirmed Paden-Battle's convictions but vacated her sentence and remanded the matter for resentencing. 464 N.J. Super. 125, 131 (App. Div. 2020). The court concluded that there was "no doubt that the sentence was enhanced because the judge believed defendant ordered Baker's execution," "despite the jury verdict, [and] enhanced the sentence imposed." Id. at 151. The Court granted certification, limited to the sentencing issue. 244 N.J. 233 (2020).

**HELD:** The Court reverses in Melvin and affirms in Paden-Battle. Article I, Paragraph 1 of the New Jersey Constitution bestows upon all citizens certain natural and unalienable rights. From those rights flows the doctrine of fundamental fairness, which protects against arbitrary and unjust government action. Fundamental fairness prohibits courts from subjecting a defendant to enhanced sentencing for conduct as to which a jury found that defendant not guilty.

1. Both the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee all criminal defendants the right to a jury trial, and -- under both Constitutions -- due process requires that the prosecution prove each element of a charged crime beyond a reasonable doubt. That burden is underscored through special weight conferred by a jury's acquittal. Not only are defendants protected from being tried a second time for an offense for which they have been acquitted, but, significantly, an acquitted defendant retains the presumption of innocence. (pp. 28-29)

2. In Apprendi v. New Jersey, which the parties here addressed, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

2

submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. 466, 490 (2000).
Here, because neither defendant was sentenced above the statutory maximum for their
counts of conviction, Apprendi is inapplicable.  (pp. 29-30)

3.  Nor does Watts control.  In Watts, the United States Supreme Court held that "a jury's
verdict of acquittal does not prevent the sentencing court from considering conduct
underlying the acquitted charge, so long as that conduct has been proved by a
preponderance of the evidence."  519 U.S. at 157.  In United States v. Booker, the Court
appeared to limit Watts and minimize its precedential value.  See 543 U.S. 220, 240 n.4
(2005).  Federal courts have broadly held that Watts survived Booker and thus permit
reliance on evidence of acquitted conduct by sentencing courts.  But the practice of
relying on acquitted conduct in sentencing has not gone unquestioned among federal
judges, and approaches to the issue among state courts have been decidedly mixed.  In
People v. Beck, the Supreme Court of Michigan concluded that "[o]nce acquitted of a
given crime, it violates due process to sentence the defendant as if he committed that very
same crime."  939 N.W.2d 213, 216 (Mich. 2019), cert. denied, 140 S. Ct. 1243 (2020).
In reaching that conclusion, the Beck court distinguished Watts on the ground that Watts
considered the use of acquitted conduct not through the lens of due process, but rather
only in "the double-jeopardy context."  Id. at 224.  The Court agrees with the Michigan
Supreme Court that Watts is not dispositive of the due process challenge presented here,
and therefore turns to the New Jersey Constitution.  (pp. 30-35)

4.  The New Jersey Constitution is a source of fundamental rights independent of the
United States Constitution.  The Federal Constitution provides the floor for constitutional
protections, and our own Constitution affords greater protection for individual rights than
its federal counterpart.  The doctrine of fundamental fairness reflects the State
Constitution's heightened protection of due process rights.  Despite the absence of the
phrase due process in that paragraph, this Court has construed the expansive language of
Article I, Paragraph 1 to embrace the fundamental guarantee of due process.  An
important part of that due process guarantee is the doctrine of fundamental fairness,
which serves as an augmentation of existing constitutional protections or as an
independent source of protection against state action.  Here, the Court applies the
doctrine to consider whether acquitted conduct may be considered in sentencing
defendants.  (pp. 35-38)

5.  The New Jersey Constitution's guarantee of the right to a criminal trial by jury is
"inviolate."  N.J. Const. art. I, ¶ 9.  In order to protect the integrity of that right, a jury's
verdict cannot be ignored through judicial fact-finding, under the lower preponderance of
the evidence standard, at sentencing.  Such a practice defies the principles of due process
and fundamental fairness.  (pp. 38-39)

6.  Melvin was convicted of second-degree unlawful possession of a weapon and
acquitted of two counts of first-degree murder, second-degree possession of a weapon for

3

an unlawful purpose, and second-degree aggravated assault.  In other words, the jury determined that Melvin had a gun but acquitted him of all charges that involved <u>using</u> the gun -- or even having the purpose to use it unlawfully.  Nevertheless, the trial court found by a preponderance of the evidence that Melvin used the firearm "to shoot upon three other human beings."  The jury's verdict should have ensured that Melvin retained the presumption of innocence for any offenses of which he was acquitted.  (pp. 39-41)

7.  And, in finding Paden-Battle guilty of kidnapping, conspiracy to commit kidnapping, and felony murder, the jury's verdict reflected its conclusion, based on the evidence, that the victim's death would not have occurred without the commission of the kidnapping in which Paden-Battle was involved.  In finding Paden-Battle <u>not guilty</u> of the remaining offenses, however, the jury <u>rejected</u> the charges that Paden-Battle was guilty of first-degree murder or first-degree conspiracy to commit murder.  Notwithstanding the jury's not-guilty verdict as to conspiracy to commit murder and murder, the trial court determined that Paden-Battle had in fact "orchestrated," "was the mastermind," "the supervisor," and "the driving force in this kidnapping and execution."  (pp. 41-42)

8.  The findings of juries cannot be nullified through lower-standard fact findings at sentencing.  The trial court, after presiding over a trial and hearing all the evidence, may well have a different view of the case than the jury.  But once the jury has spoken through its verdict of acquittal, that verdict is final and unassailable.  The public's confidence in the criminal justice system and the rule of law is premised on that understanding.  Fundamental fairness simply cannot let stand the perverse result of allowing in through the back door at sentencing conduct that the jury rejected at trial. (pp. 42-43)

9.  The sentencing court's reliance on <u>Watts</u> was a reasonable approach adopted by a number of other jurisdictions with regard to an issue that this Court had yet to consider.  Although the Court finds today -- as is true with regard to many constitutional issues -- that the New Jersey Constitution offers greater protection against the consideration of acquitted conduct in sentencing than does the Federal Constitution, the sentencing court's approach at the time was not unreasonable.  Both Melvin and Paden-Battle have requested that their matters be assigned to a different judge should the Court agree that resentencing is appropriate.  Although the trial judge's interpretation of <u>Watts</u> was entirely logical and the Court has no doubt that on remand, the trial judge would adhere to the Court's ruling, the Court believes that in this instance, reassigning these matters is the best course when viewing the cases through the eyes of the defendants.  (pp. 43-44)

**The judgment of the Appellate Division is REVERSED in <u>Melvin</u> and AFFIRMED in <u>Paden-Battle</u>.  Both matters are REMANDED for resentencing.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.**

# SUPREME COURT OF NEW JERSEY

A-44 September Term 2019

A-13 September Term 2020

083298 and 084603

State of New Jersey,

Plaintiff-Respondent,

v.

Mark Melvin,

Defendant-Appellant.

State of New Jersey,

Plaintiff-Appellant,

v.

Michelle Paden-Battle, a/k/a
Michelle A. Paden, Mama Michelle,

Defendant-Respondent.

State v. Mark Melvin (A-44-19)
On certification to the Superior Court,
Appellate Division.

State v. Michelle Paden-Battle (A-13-20)
On certification to the Superior Court,
Appellate Division, whose opinion is reported at
464 N.J. Super. 125 (App. Div. 2020).

1

Argued                              Decided
February 1, 2021              September 23, 2021

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant in State v. Mark Melvin (A-44-19) (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent in State v. Mark Melvin (A-44-19) (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the briefs).

Emily M.M. Pirro, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant in State v. Michelle Paden-Battle (A-13-20) (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Emily M.M. Pirro, of counsel and on the briefs).

Molly O'Donnell Meng, Assistant Deputy Public Defender, argued the cause for respondent in State v. Michelle Paden-Battle (A-13-20) (Joseph E. Krakora, Public Defender, attorney; Molly O'Donnell Meng, of counsel and on the briefs, and Monique Moyse, Designated Counsel, on the briefs).

Sarah D. Brigham, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in State v. Mark Melvin (A-44-19) and State v. Michelle Paden-Battle (A-13-20) (Gurbir S. Grewal, Attorney General, attorney; Sarah D. Brigham, of counsel and on the brief).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey in State v. Mark Melvin (A-44-19) and State v. Michelle Paden-

2

Battle (A-13-20) (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, Jeanne LoCicero, and Karen Thompson, on the brief).

Joseph A. Hayden, Jr., argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. Mark Melvin (A-44-19) and State v. Michelle Paden-Battle (A-13-20) (Pashman Stein Walder Hayden, attorneys; Joseph A. Hayden, Jr., and Dillon J. McGuire, on the brief).

Jonathan Romberg argued the cause for amicus curiae Seton Hall University School of Law Center for Social Justice in State v. Michelle Paden-Battle (A-13-20) (Seton Hall University School of Law Center for Social Justice, attorneys; Jonathan Romberg, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

One of the most important tenets of our criminal justice system is the finality of a jury's verdict of acquittal. These consolidated appeals test that principle through a common legal issue: whether a trial judge can consider at sentencing a defendant's alleged conduct for crimes for which a jury returned a not guilty verdict.

In State v. Melvin, the jury found Melvin guilty of second-degree unlawful possession of a handgun and, after two trials, not guilty of the most serious charges against him, including first-degree murder and first-degree attempted murder. At his second sentencing, the trial court -- notwithstanding

3

the jury's not-guilty verdicts on the murder charges -- determined that the evidence at trial supported the conclusion that Melvin shot the victims. Citing United States v. Watts, 519 U.S. 148 (1997), the trial judge found that it was within the court's broad discretion at sentencing to consider all circumstances of the case, including evidence that Melvin was the shooter. Despite the jury's verdict, the trial court found that Melvin not only possessed the weapon, but used it to shoot three people. The trial court sentenced Melvin to a term of sixteen years' imprisonment with an eight-year period of parole ineligibility. The Appellate Division affirmed that sentence.

In State v. Paden-Battle, in a trial before the same judge who presided over Melvin's case, the jury found Paden-Battle guilty of kidnapping, conspiracy to commit kidnapping, and felony murder. The jury acquitted Paden-Battle of the remaining seven counts, including first-degree murder and conspiracy to commit murder. At sentencing, the trial judge again relied on Watts to make findings of fact, by a preponderance of the evidence, that Paden-Battle, despite having been acquitted of the most serious murder charges, was the mastermind who orchestrated the victim's murder. The trial court stated that Paden-Battle falsified her testimony and found that she was the moving force behind the murder and ordered her co-conspirators to act. The trial court sentenced Paden-Battle to a sixty-year sentence. On appeal, the

4

Appellate Division vacated Paden-Battle's sentence and remanded the matter for resentencing, holding that the trial court enhanced her sentence based on its belief -- a belief contrary to the jury's verdict -- that Paden-Battle ordered the execution.

We granted the petitions for certification in both cases and now reverse in <u>Melvin</u> and affirm in <u>Paden-Battle</u>. Article I, Paragraph 1 of the New Jersey Constitution bestows upon all citizens certain natural and unalienable rights. From those rights flows the doctrine of fundamental fairness, which "protects against arbitrary and unjust government action." <u>State v. Njango</u>, 247 N.J. 533, 537 (2021). For the reasons stated below, we hold today that fundamental fairness prohibits courts from subjecting a defendant to enhanced sentencing for conduct as to which a jury found that defendant not guilty.

I.

We begin by reviewing the facts and procedural history in <u>State v. Melvin</u>.

A.

In September 2012, a masked man wearing a gray hooded sweatshirt entered a Newark restaurant, where he shot and killed two men and injured a woman, the restaurant's owner and cook. The man fled the scene in a green Dodge Magnum until his vehicle ran out of gas. Soon after, police pulled up

5

behind the stopped vehicle and found Mark Melvin in the driver's seat along with another individual seated in the passenger's seat.

When police approached, Melvin exited the vehicle and ran, but police quickly apprehended and arrested him. Police searched the area and recovered two non-matching gloves and a gray hooded sweatshirt from backyards Melvin ran through during the chase. Police recovered from Melvin's vehicle an automatic handgun, one hundred decks of heroin, and a black mask consistent with the one used in the homicides. Ballistic testing confirmed that the handgun recovered from the vehicle matched the gun used in the shooting. In addition, DNA testing confirmed that the blood of one of the victims was found on the gray hooded sweatshirt.

On May 31, 2013, an Essex County Grand Jury charged Melvin in a nine-count indictment with the following: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (Counts I and V); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (Count II); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (Count III); first-degree attempted murder, N.J.S.A. 2C:5-1 and :11-3 (Count IV); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (Count VI); third-degree unlawful possession of a controlled dangerous substance (CDS) (heroin), N.J.S.A. 2C:35-10(a)(1) (Count VII); third-degree possession of CDS (heroin) with

6

intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3) (Count VIII); and third-degree unlawful possession of a CDS (heroin) with the intent to distribute within 1,000 feet of a school, N.J.S.A. 2C:35-7 (Count IX).[1]

At trial, the State submitted DNA and ballistic evidence, police testimony, and the testimony of Jahod Marshall, who was the passenger in Melvin's vehicle. Marshall testified that on the morning of the shooting, he was playing basketball when Melvin flagged him down and told him to get into his car. Marshall complied, and the men drove away. Marshall further testified that Melvin parked near the restaurant and exited the car. Marshall then heard gunshots before Melvin rushed back into the vehicle, wearing a gray hooded sweatshirt and carrying a gun, and drove off until the vehicle ran out of gas.

At the conclusion of the trial, the jury found Melvin guilty of second-degree unlawful possession of a handgun, but they remained deadlocked on the outstanding counts. Ordinarily, a second-degree offense carries a potential of five to ten years' imprisonment, but the State motioned the court to sentence Melvin to an extended term based on his criminal history. See N.J.S.A. 2C:44-

---

[1] The State dismissed Count IV prior to the start of trial.

3(a). Melvin conceded he was eligible for an extended term as a persistent offender, and the court granted the State's motion.

With the discretion to sentence Melvin to an extended term of ten to twenty years, see N.J.S.A. 2C:43-6(a)(1), the trial court sentenced Melvin to the maximum -- an aggregate twenty-year prison term with ten years of parole ineligibility. The sentencing judge cited Watts, 519 U.S. 148 (1997), and State v. Jarbath, 114 N.J. 394, 412 n.4 (1989), in his consideration of Melvin's conduct -- specifically, the evidence relating to the murder charges as to which the jury was hung. The sentencing judge determined that "by a preponderance of the credible evidence at trial, . . . Melvin did in fact use a firearm, which resulted in the death of [the two victims] and the injury to [the restaurant owner]." Melvin subsequently appealed his conviction and sentence.

B.

In an unpublished opinion, the Appellate Division affirmed Melvin's conviction for second-degree unlawful possession of a handgun but remanded the matter for resentencing. The court held that the sentencing judge incorrectly applied Watts and Jarbath and that a judge cannot act as a "thirteenth juror" by "substitut[ing] his judgment for that of the jury." The court further noted that "[t]he judge abused his discretion by finding [Melvin]

8

was the shooter by a preponderance of the evidence and considering that conduct in his sentencing decision."

Thereafter, this Court denied Melvin's petition for certification and the State's cross-petition. 230 N.J. 597 (2017); 230 N.J. 600 (2017).

C.

At the retrial of the deadlocked counts, Melvin was acquitted on Counts I, III, V, and VI, and the State dismissed Counts VII, VIII, and IX, resolving all remaining charges against Melvin. The same judge who presided over the first trial and sentencing handled Melvin's retrial and resentencing. The judge again cited Watts in his determination that "the evidence at the trial support[ed] a conclusion that [Melvin] was the shooter of the two individuals" at the restaurant. The judge stated that,

> Significantly, this [c]ourt is considering that evidence to determine 1) the aggravating and mitigating factors for sentencing, 2) whether to . . . apply an extended term of imprisonment, and 3) where within the extended term should . . . Melvin be sentenced. This [c]ourt is not relying upon that evidence to impose a sentence for some other charge because no other charge is before this [c]ourt.
>
> Unlike the first trial, . . . Melvin no longer faces the possibility of jeopardy on the acquitted conduct[] as . . . he's been found not guilty of some charges and other charges have been dismissed. This [c]ourt views the consideration of that evidence I just referred to, of . . . Melvin as the shooter, as totally consistent with the

9

> broad discretion which is accorded to a trial, a sentencing judge when imposing an appropriate sentence in evaluating the whole man and the entire circumstances of the case. That is this [c]ourt's duty. And the [c]ourt . . . , in the exercise of that duty has determined to consider that evidence.

The trial court applied aggravating factors three (risk defendant will commit another crime), six (extent of defendant's prior criminal record and the seriousness of the offense), and nine (the need to deter defendant and others from violating the law). See N.J.S.A. 2C:44-1(a)(3), (6), (9). The court did not apply any mitigating factors. The trial judge noted that "Melvin was on supervised release from his prior federal conviction" when he committed the offense in the present matter. Contrary to the jury's verdict, the trial court added that Melvin "not only . . . possess[ed] said weapon, but he used it to shoot upon three other human beings." The court further reasoned that Melvin's "prior contact with the criminal justice system ha[d] not deterred him," and provided a basis for applying aggravating factor nine. Last, the court found that Melvin's record qualified him as a persistent offender.

The trial court resentenced Melvin to an aggregate extended term of sixteen years with an eight-year period of parole ineligibility.

D.

Melvin appealed again, claiming that (1) he was sentenced for crimes contrary to the jury's verdict; (2) his sentence was excessive; and (3) his judgment of conviction needed to be amended to reflect his jail credits.

In an unpublished decision, the Appellate Division affirmed Melvin's sixteen-year extended term sentence. Citing State v. Tillery, 238 N.J. 293 (2019), the court rejected Melvin's argument that the sentencing judge "double-counted by considering evidence of the homicides and aggravated assault in finding the aggravated sentencing factors." The panel further reasoned that the sentencing

> judge properly determined [Melvin] was eligible for an extended term based upon his four prior convictions. The [sentencing] judge then weighed the aggravating sentencing factors by considering not only [Melvin]'s prior record, but also the nature of the offense and "other aspects of . . . [Melvin]'s record." State v. Dunbar, 108 N.J. 80, 92 (1987).
>
> [(omission in original).]

Ultimately, the court concluded that Tillery "dispose[d] of defendant's argument."

We granted Melvin's petition for certification, "limited to the issue of whether the sentencing judge could consider defendant's conduct even though the jury acquitted defendant of the underlying crimes." 240 N.J. 549 (2020).

11

II.

We next turn our attention to State v. Paden-Battle, and we rely on the testimony at trial for the following summary.

A.

This case arises from the kidnapping and murder of Bloods street gang member Regina Baker.  Baker was a member of the Mob Piru set of the Piru Bloods in Jersey City but had previously been part of the Lueders Park Piru (LPP) set out of Newark.  At the time of her murder, Baker lived in Jersey City with her children and Natassia Hernandez.

According to several witnesses, defendant Paden-Battle, known as "Mama L,"[2] was a member of the LPP set based in Newark.[3]  Witnesses testified that Paden-Battle was a "First Lady," the highest rank in a gang for a female member.  Paden-Battle, however, maintained throughout trial that she was not a gang member at all.  Witnesses stated that, as First Lady, defendant had control over the gang members ranked below her and could tell them what to do.  Cierra Long was one of defendant's "pups," or a subordinate ranking below defendant.  Davia Younger -- another one of defendant's "pups" in LPP

---

[2]  Defendant is also referred to as "Momma Elm" in the briefs and transcripts.

[3]  This set is often also referred to as "Looters Park" in the briefs and transcripts.

12

-- testified that if you disobeyed the First Lady, you would get disciplined or beaten up.

Omar Martin was also a member of the LPP and held the rank of "G." Martin testified that First Lady and "G" are about the same rank. Karon Adams, another member of the Bloods, fired the gun shots that killed Baker, according to witnesses. In addition, Martin's friend, Damon Zengotita, was the driver on the day in question and used the evening as his gang initiation.

The incident that led to Baker's murder involved Baker allegedly committing the very serious gang offense of "false claiming" -- lying about her rank in the gang. As a result of her "false claiming," Baker was labeled "food," which meant that she was someone to be killed or beaten up on sight.

The State and Paden-Battle's versions of the events on the night of Baker's murder differ significantly.

The State's Version of Events

On June 16, 2012, Paden-Battle, Long, Martin, Adams, and Zengotita drove from Paden-Battle's house in Newark to Jersey City in search of Baker. Witnesses testified that Paden-Battle wanted to settle the issues with Baker that night and sought to bring Baker back to Newark. When the group arrived in Jersey City, they asked around to determine Baker's whereabouts and were

13

directed to the home of Natassia Hernandez.  The group met up with Younger while in Jersey City.

While en route to Hernandez's residence, Paden-Battle called Hernandez on the phone, told her that she knew that Baker was at Hernandez's residence, and demanded that Hernandez "tell that b---- to come outside, get the f--- out, kick her out your house or something" -- "[m]an that b---- know she's dead, I ain't off that s--- . . . [y]o, I'm not leaving here 'til I get this b---- tonight, like this going to end tonight with that b----."

When the group arrived at Hernandez's residence, an argument ensued between Paden-Battle and Hernandez, with Paden-Battle continuing her demand that Baker come out of the house.  Baker eventually came downstairs, but remained inside the doorway of the home as she proceeded to argue with Paden-Battle.  At one point during the argument, Martin and Adams walked away from the house and Martin testified that he obtained a gun from Adams. Martin testified that he was getting agitated that the argument between Paden-Battle and Baker was taking so long, so he pointed the gun at Baker's head and, along with Adams, forcibly pulled Baker onto the street toward the car. Martin and Adams then forced Baker into the trunk of the car against her will. As Baker struggled to break free, Martin struck Baker with the butt of the gun twice, while Younger assisted by closing the trunk.  According to Hernandez,

14

Paden-Battle then commanded her co-conspirators to "get the f--- in the car." The events outside of Hernandez's home were all captured on video surveillance camera, but there was no audio on the recording.

On the ride back to Newark, Paden-Battle was concerned that Baker had a cell phone on her. She instructed the driver to pull the car over, and then Paden-Battle, Adams, and Martin got out of the car and opened the trunk. Martin held a gun to Baker and demanded her phone. Although she initially refused, Baker complied after Martin clicked his gun at her. Baker handed the phone to Paden-Battle and either Paden-Battle or Adams threw Baker's cell phone into a nearby body of water. The group then drove to Newark.

Once in Newark, the group displayed Baker, who was still in the trunk, to a group of people near a housing project. According to Martin, Paden-Battle told him and Adams to "handle the situation," which Martin understood to mean that he was to kill Baker. Paden-Battle, Long, and Younger went back to Paden-Battle's home as Martin, Adams, and Zengotita drove away with Baker in the trunk.

The men took Baker to an abandoned townhouse on South 15th Avenue in Newark. Baker pleaded with Adams not to kill her, but Adams took Baker inside the townhouse and shot her five times in the back, torso, and arms. Martin hid the gun and the three men drove back to Paden-Battle's house "to

15

let her know the situation was handled." Younger testified that Paden-Battle proclaimed that she would take the charges if any criminal charges resulted from the incident. Martin, Long, and Younger all testified for the State and claimed that Paden-Battle orchestrated Baker's kidnapping and murder.

The next day, Paden-Battle was informed that someone was cooperating with the police, and, in response, she met with Martin and ordered him to cut his dreadlocks. Baker's body was discovered by law enforcement two days later in the early morning hours of June 19, 2012 in the abandoned townhouse. That same day, Long went to the police and gave a statement. While Long was in a police vehicle en route to the police station, Paden-Battle called her to inform her that the police "found it" and that Paden-Battle was "changing [her] number." Long also testified that Paden-Battle saw the police raid Paden-Battle's home while she was next door visiting a friend.

On June 26, 2012, Paden-Battle was arrested by the police in Newark.

#### Paden-Battle's Version of Events

According to Paden-Battle, she was not a member of any gang and was simply friends with people in the neighborhood who were in gangs. Paden-Battle testified that her only role in the Jersey City altercation was that she was there to "try . . . [and] diffuse the situation" with Baker, Long, and Younger. Paden-Battle testified it was her understanding that there was a rift between

16

Long and Baker that started when Baker's friends spat on Long and tried to beat Long up when Long was with her daughter. Because Long was living with Paden-Battle at the time, Paden-Battle claimed she was privy to the constant arguing over the phone among Long, Younger, and Baker and wanted to help bring an end to the issue.

Paden-Battle stated that when the group arrived in Jersey City, an argument ensued between Martin and Baker outside of Hernandez's home. It was at that point that Martin pulled out a gun, put it to Baker's head, and forced Baker into the trunk of the car. Paden-Battle further claimed that Martin forced her into the car by pointing a gun in her direction. Paden-Battle testified that she was scared and started crying in the car, at which point Martin yelled at her and everyone in the car and told them all to "shut the f--- up." Paden-Battle further testified that, following the incident, she fled her apartment with her daughter and stayed with her boyfriend because she was afraid that Martin would come and kill her and the other women.

B.

On March 13, 2015, an Essex County Grand Jury indicted Paden-Battle[4]

---

[4] Co-defendant Martin was indicted on eleven counts, including all of the counts charged against Paden-Battle. Co-defendant Zengotita was indicted on Counts I, II, and VI through X.

17

for second-degree conspiracy to commit kidnapping, N.J.S.A. 2C:5-2 (Count I); first-degree kidnapping, N.J.S.A. 2C:13-l(b)(l) (Count II); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 (Count VI); first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (Count VII); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (Count VIII); second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b) (Count IX); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (Count X); and first-degree gang criminality, N.J.S.A. 2C:33-29 (Count XI).  Prior to trial, the court dismissed Count XI.

A jury trial began on April 13, 2017, with Martin, Long, and Younger each cooperating as State's witnesses.[5]  The trial was conducted before the same judge in Essex County who presided over Mark Melvin's trials and sentencings.

After the State rested its case-in-chief, Paden-Battle's counsel moved for a judgment of acquittal on the murder charges, but the motion was denied.  On May 3, 2017, the jury convicted Paden-Battle on the charges of kidnapping, conspiracy to commit kidnapping, and felony murder, and acquitted Paden-

_____

[5]  Martin and Adams pleaded guilty to kidnapping, conspiracy to commit murder, aggravated manslaughter, and unlawful possession of a handgun. Younger and Long pleaded guilty to conspiracy to commit kidnapping.

18

Battle of first-degree murder, conspiracy to commit murder, and both weapons offenses.

## C.

On August 4, 2017, at Paden-Battle's sentencing hearing, the trial court merged the kidnapping and conspiracy to commit kidnapping charges with the felony murder charge. For the felony murder conviction, Paden-Battle faced 30 years to life imprisonment. Counsel for Paden-Battle asked the trial court to consider that Adams, who shot and killed Baker, would receive a twenty-year sentence and Martin, who was with Adams at the shooting, would receive a twenty-three-year sentence at most.[6] Counsel for Paden-Battle requested that the court sentence Paden-Battle to the statutory minimum of thirty years.

Despite Paden-Battle's plea for leniency, the trial court imposed a sixty-year sentence pursuant to NERA and the Graves Act, N.J.S.A. 2C:43-6(c). The trial court noted that Paden-Battle's refusal to admit any responsibility for the acts that ended in Baker's murder was the reason for the extended sentence. The trial judge also stated,

> Where defendant, having an opportunity to speak, not just to the [c]ourt but to the family of the deceased. Continues that she did not know what was going on. That she denies responsibility for the acts that resulted in the murder of Regina Baker. And this total lack of appreciation for what one human being can do to

---

[6] Adams and Martin both ultimately received twenty-year sentences.

19

another marks this case as the most glaring indictment of how poorly human beings can treat each other.

The facts established during this trial and I find it by reliable evidence having had the opportunity, the privilege indeed to sit in this trial. That yes, Michelle Paden-Battle did not pull the trigger, five times, that resulted in the death of Ms. Baker. However, were it not for Michelle Paden-Battle I am convinced that Regina Baker would be alive today. Because Michelle Paden-Battle set forth a series of events. She orchestrated, she was the master mind, she was the supervisor, she was the driving force in this kidnapping and execution of Regina Baker.

The trial judge further noted,

And for what reason . . . does the evidence [show] that human life was taken, because Regina Baker misrepresented her stain or her rank within the Bloods. And for that mis-representation of rank, Michelle Paden-Battle who [is] the first lady of [LPP] . . . , they said to the Bloods determined in the exercise of her apparent authority within the Bloods that Regina Baker was food and that her life shall cease.

In executing those orders Ms. Paden-Battle summoned her co-conspirators to her house. They went to Jersey City. And those co-conspirators included the muscle which was, Omar Martin and Karon Adams. She summoned one of her pups that was [C]ierra Long . . . who's testimony completely undermines any claim that the defendant is not a Bloods member.

In fact the PSI reflects that the Piru tattoo is on her neck. And so she got [on] the stand and testified in front of a jury that she was not a member of the Bloods. She was not a gang member when she had that tattoo on

20

her neck. And that's not the only time she lied on the stand, I'll get to that.[7]

The trial court analyzed the aggravating and mitigating factors and determined that aggravating factors three, five (N.J.S.A 2C:44-1(a)(5), substantial likelihood that the defendant is involved in organized criminal activity), six, and nine applied. The court also applied mitigating factor seven, N.J.S.A 2C:44-1(b)(7) (no criminal history or substantial period of time since last criminal act). Specifically, in its finding of aggravating factor three -- risk of committing another crime -- the trial court found it

> clearly applicable as the defendant ha[d] not accepted responsibility for her criminal conduct . . . .
>
> Clearly the defendant's exercise of her constitutional right to jury trial does not necessarily equate with a denial of responsibility. She could have simply left the State to its proofs. However, reliable evidence before this [c]ourt establishes that the defendant falsely testified before the jury and otherwise sought to obstruct the investigation and prosecution of the matter.
>
> During the trial the defendant testified that she sought to act as a peace maker. And that she was not a gang member and she did not intercede on Ms. Baker's behalf . . . because Omar Martin posed a -- pointed a handgun at her. Each of these claims is demonstrably false.

---

[7] Neither the State nor defense counsel mentioned the appearance of the Bloods tattoo during the trial.

21

The trial judge further stated that the reliable evidence showed Paden-Battle falsified her testimony and that she "was the moving force behind this senseless act of brutality."

After detailing findings to support the other applicable factors, the court turned to Paden-Battle's argument that Martin and Adams should be assessed more culpability, stating that

> the defendant is more culpable due to her supervisory role over these co-defendants and the commission of the kidnapping and homicide. . . . [S]he was clearly -- she was clearly orchestrating the events, providing instruction. She was in charge. Although she did not pull the trigger. They did so on her orders.

The trial court found any disparity in sentencing for Martin and Adams justifiable because Martin and Adams both accepted responsibility for their crimes, pled guilty, and assisted in the prosecution of the other actors. As a result, the sentencing judge determined that the aggravating factors strongly outweighed the lone mitigating factor and justified Paden-Battle's sixty-year prison term.

D.

On appeal, the Appellate Division affirmed Paden-Battle's convictions but vacated her sentence and remanded the matter for resentencing. State v. Paden-Battle, 464 N.J. Super. 125, 131 (App. Div. 2020). Paden-Battle argued that (1) the jury instructions were erroneous, (2) the trial court failed to

22

properly instruct the jury on her two defenses, and (3) her sentence was excessive and based on improper considerations. Ibid. The Appellate Division determined that

> the judge sentenced defendant based on his own view of the evidence, finding that even though defendant "did not pull the trigger," others did "on her orders" . . . . The State candidly acknowledges that this is what the judge did, arguing in its brief that "[i]t was not improper for [the judge] to credit evidence that the jury did not." We disagree.
>
> [Id. at 146-47 (alterations in original) (footnote omitted).]

The court concluded that there was "no doubt that the sentence was enhanced because the judge believed defendant ordered Baker's execution," "despite the jury verdict, [and] enhanced the sentence imposed." Id. at 151.

We granted the State's petition for certification, limited to the sentencing issue. 244 N.J. 233 (2020). We also denied Paden-Battle's cross-petition for certification. 244 N.J. 257 (2020). We granted amicus curiae status to the American Civil Liberties Union of New Jersey (ACLU), the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the Seton Hall University School of Law Center for Social Justice (Center for Social Justice). The Attorney General, having participated as an amicus before the Appellate Division in Paden-Battle's matter, has continued to participate in that case and also moved successfully to appear as an amicus in Melvin's case.

23

III.

Because the parties' arguments are substantially similar in both cases, we consider them together.

A.

Defendants argue that sentencing based on acquitted conduct violated their federal and state constitutional rights to due process and fundamental fairness. Defendants assert that punishing a person for conduct of which a jury acquitted them violates the protection afforded by acquittal and undermines the purpose of a jury trial.

More specifically, Melvin contends that acquitted conduct evaluated under the preponderance-of-the-evidence standard violated due process, contrary to Apprendi v. New Jersey, 530 U.S. 466 (2000). Melvin requests that this Court join states like Michigan, Hawaii, North Carolina, New Hampshire, and Georgia in prohibiting a trial court from using acquitted conduct to determine a defendant's sentence. Lastly, because he has already served eight years in prison, Melvin asks this Court to sentence him to time served or remand his matter for resentencing before a different judge.

Paden-Battle argues that the Appellate Division correctly determined that the trial judge unlawfully sentenced her for acquitted conduct and urges

this Court to affirm that ruling. Paden-Battle also requests that her case be remanded for sentencing before a different judge.

B.

The ACLU argues that the present matters raise policy concerns, due process issues, and undermine the import of jury verdicts. The ACLU contends that punishing defendants for acquitted conduct increases pressure on defendants to plead guilty by distorting trial strategy and forcing defendants to influence two different decision makers -- the judge and the jury. The ACLU asserts that, although New Jersey defendants are rarely punished for acquitted conduct, and it is their organization's understanding that only one Superior Court judge in Essex County adheres to the practice, this Court should make clear that the New Jersey Constitution does not allow sentencing under such circumstances.

The ACDL argues that a trial court's reliance on an aggravating factor inconsistent with the jury verdict violates the essence of Apprendi and the New Jersey Constitution. The ACDL notes that seven current and former Supreme Court justices, as well as numerous federal and state court judges, have expressed concerns about Watts. Finally, the ACDL asserts that the New Jersey Constitution is a source of fundamental rights, not dependent on federal case law or the United States Constitution.

25

The Center for Social Justice supports Paden-Battle's position, arguing that the Sixth Amendment bars a judge from usurping the jury's fact-finding role. The Center for Social Justice also argues that sentencing based on acquitted conduct violates the New Jersey Constitution, principles of fundamental fairness, due process, and the right to fair notice.

C.

The State submits that a judge may sentence a defendant within the sentencing guidelines based on relevant aggravating and mitigating factors supported by "competent, credible evidence in the record." The State notes that sentencing judges have far-ranging discretion as to what sources and types of evidence they may use to sentence defendants. According to the State, the sentencings in these cases are both valid under Watts. Moreover, the State asserts that no constitutional mandates are violated by allowing judges to consider acquitted conduct in sentencing determinations. The State further submits that California, Pennsylvania, Connecticut, Illinois, Missouri, and Alaska permit judges to consider acquitted conduct or conduct related to unadjudicated arrests in assessing punishment. The State also argues that Apprendi does not apply to these cases because defendants were not sentenced beyond the prescribed statutory maximum for their counts of conviction. The

State urges this Court to affirm the Appellate Division's decision in Melvin's matter and reverse the Appellate Division's ruling in Paden-Battle's case.

The Attorney General joins the State in this matter and asserts that acquitted conduct should be considered to assess the "whole person," which includes details of the underlying offense. The Attorney General avers that a judge has broad discretion in sentencing a defendant within the range permitted by the jury verdict. Regarding Paden-Battle, the Attorney General argues that considering the evidence that underlies an acquitted charge does not present a double-jeopardy issue because a court is permitted to increase a defendant's punishment based on the manner in which she committed her convicted crime. Lastly, the Attorney General contends that the judge appropriately balanced the sentencing factors and properly sentenced Paden-Battle.

IV.

A.

Although "[a]ppellate review of sentencing is deferential," that deference presupposes and depends upon the proper application of sentencing considerations. State v. Case, 220 N.J. 49, 65 (2014). This appeal challenges not the application of permissible considerations, but rather the permissibility of the considerations the sentencing court applied. Whether the consideration

27

of acquitted conduct in sentencing a defendant comports with the New Jersey Constitution is a question of law, and our review is therefore de novo.  See Tillery, 238 N.J. at 314.

B.

We begin our analysis by clarifying its scope.  Much of the oral argument and briefing in these matters focused on Watts and Apprendi, but we find that neither case controls here.

Both the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee all criminal defendants the right to a jury trial and -- under both Constitutions -- due process requires that the prosecution "prove each element of a charged crime beyond a reasonable doubt."  State v. Hill, 199 N.J. 545, 558-59 (2009) (citing In re Winship, 397 U.S. 358, 364 (1970), with regard to the United States Constitution and State v. Anderson, 127 N.J. 191, 200-01 (1992), with regard to the State Constitution).  That burden is underscored through "special weight" conferred by a jury's acquittal.  United States v. DiFrancesco, 449 U.S. 117, 129 (1980).  Not only are defendants protected from being tried a second time for an offense for which they have been acquitted, see U.S. Const. amend V; N.J. Const. art. I, ¶ 11, but, significantly, an acquitted defendant retains the presumption of innocence, DiFrancesco, 449 U.S. at 129.  Indeed, a

28

"jury's verdict of acquittal represents the community's collective judgment regarding all the evidence and arguments presented to it." Yeager v. United States, 557 U.S. 110, 122 (2009). Thus, "[e]ven if the verdict is 'based upon an egregiously erroneous foundation,' Fong Foo v. United States, 369 U.S. 141, 143 (1962), its finality is unassailable," Yeager, 557 U.S. at 122-23. In Apprendi and Watts, the United States Supreme Court distinguished discretionary sentencing determinations from the adjudication of elements of an offense with respect to acquitted conduct.

In Apprendi, the Court examined New Jersey's "hate crime" statute, which allowed a judge to impose an "enhanced" sentence based upon a judicial finding by a preponderance of the evidence that the defendant intended to intimidate the victim for racial reasons. 530 U.S. at 468-70. The defendant pled guilty to two counts of second-degree possession of a firearm for an unlawful purpose, as well as to a lesser charge. Id. at 469-70. On the second-degree charges to which he pled guilty, he faced a prison term of five to ten years. Id. at 470. Under the "hate crime" statute, the judge was empowered to sentence defendant to effectively one degree higher, within the range of ten to twenty years, provided the judge found the crime was committed "with a purpose to intimidate an individual or group of individuals" for reasons such as race or color. Id. at 468-69.

After a sentencing hearing, the trial judge determined that a preponderance of the "evidence supported a finding that the crime was motivated by racial bias"; therefore, the judge imposed a twelve-year prison term, which was two years more than the maximum sentence for a second-degree crime. Id. at 470-71 (quotation omitted). The Apprendi Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Finding the hate crime statute to be "an unacceptable departure from the jury tradition," the Court declared the defendant's sentence unconstitutional. Id. at 497. The Court noted, however, that when imposing a sentence within the statutory limits, judges may still consider the traditional factors relating to the crime and the offender. Id. at 481.

Here, because neither defendant was sentenced above the statutory maximum for their counts of conviction, Apprendi is inapplicable.

Nor does Watts control. The sentencing court here relied on Watts in considering conduct for which defendants were acquitted. In Watts, the United States Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."

30

519 U.S. at 157. Stressing that convictions require proof beyond a reasonable doubt, whereas sentencing factors require proof by only a preponderance of the evidence, the Watts Court observed that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." Id. at 156 (quoting Dowling v. United States, 493 U.S. 342, 349 (1990)), in which the Court noted that acquitted conduct could nevertheless be presented as evidence under Fed. R. Evid. 404(b)). The Watts Court also emphasized the uncertainty inherent in a jury's acquittal, explaining that "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge," and therefore, the "jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." Id. at 155.

In United States v. Booker, the Court appeared to limit Watts and minimize its precedential value. See 543 U.S. 220, 240 n.4 (2005) ("Watts, in particular, presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument. It is unsurprising that we failed to consider fully the issues presented to us in these cases." (citing 519 U.S. at 171 (Kennedy, J., dissenting))). Federal courts have broadly held that Watts survived Booker and thus permit reliance on evidence of acquitted conduct by

sentencing courts.  See Eang Ngov, Judicial Nullification of Juries:  Use of Acquitted Conduct at Sentencing, 76 Tenn. L. Rev. 235, 258-60 & nn. 142-52 (2009).

But the practice of relying on acquitted conduct in sentencing has not gone unquestioned among federal judges.  See, e.g., United States v. Brown, 892 F.3d 385, 415 (D.C. Cir. 2018) (Kavanaugh, J., dissenting in part) ("[T]here are good reasons to be concerned about the use of acquitted conduct at sentencing, both as a matter of appearance and as a matter of fairness . . . ."); id. at 408 (Millett, J., concurring) (agreeing that Circuit precedent compelled the court's conclusion but writing separately to stress that "the constitutionally troubling use of acquitted conduct" to increase a sentence "guts the role of the jury in preserving individual liberty and preventing oppression by the government"); United States v. Canania, 532 F.3d 764, 778 (8th Cir. 2008) (Bright, J., concurring) (noting that "the consideration of 'acquitted conduct' undermines the notice requirement that is at the heart of any criminal proceeding" and wondering "what the man on the street might say about this practice of allowing a prosecutor and judge to say that a jury verdict of 'not guilty' for practical purposes may not mean a thing").

And approaches to the issue among state courts have been decidedly mixed.  Some courts have followed Watts in some form.  See, e.g., In re Coley,

283 P.3d 1252, 1275 (Cal. 2012) ("Both the United States Supreme Court and this court have expressly held that a trial court, in exercising its discretion in sentencing a defendant on an offense of which he or she has been convicted, may take into account the court's own factual findings with regard to the defendant's conduct related to an offense of which the defendant has been acquitted, so long as the trial court properly finds that the evidence establishes such conduct by a preponderance of the evidence."); State v. Jaco, 156 S.W.3d 775, 780 (Mo. 2005) (holding that, because a defendant's sentence was within the original unenhanced range of punishment, "any facts that would have tended to assess her punishment within that range were not required to be found beyond a reasonable doubt by a jury"); State v. Longo, 608 N.W.2d 471, 474-75 (Iowa 2000) (adopting the logic of Watts based on Iowa's prior recognition of the "lower standard of proof at the sentencing stage").

Other courts, however, have declined to follow Watts. See, e.g., State v. Cote, 530 A.2d 775, 784 (N.H. 1987) (holding that a sentencing court cannot consider acquitted conduct in rendering its sentence, because the presumption of innocence is "not to be forgotten after the acquitting jury has left, and sentencing has begun"); State v. Koch, 112 P.3d 69, 79 (Haw. 2005) (holding that the circuit court had erred by assuming, in sentencing the defendant, that

33

he "had engaged in unlawful conduct of which he had been expressly acquitted").

In People v. Beck, the Supreme Court of Michigan concluded that "[o]nce acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." 939 N.W.2d 213, 216 (Mich. 2019), cert. denied, 140 S. Ct. 1243 (2020). The court explained that

> when a jury has specifically determined that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent. "To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself."
>
> [Id. at 225 (quoting State v. Marley, 364 S.E.2d 133, 139 (N.C. 1988)).]

In reaching that conclusion, the Beck court distinguished Watts on the ground that Watts considered the use of acquitted conduct not through the lens of due process, but rather only in "the double-jeopardy context." Id. at 224. The court also determined that case law relating to uncharged conduct was inapposite with respect to acquitted conduct. Id. at 221-24. The Beck court thus declared that it would consider the question of due process "on a clean slate." Id. at 224-25; accord id. at 226 ("[W]e do not believe existing United States Supreme Court jurisprudence prevents us from holding that reliance on

34

acquitted conduct at sentencing is barred by the Fourteenth Amendment."); see also Commonwealth v. Howard, 677 N.E.2d 233, 236 (Mass. App. Ct. 1997) (noting that Watts applied the federal sentencing guidelines and that its holding as to acquitted conduct did not affect application of Massachusetts's sentencing scheme).

We agree with the Michigan Supreme Court that Watts is not dispositive of the due process challenge presently before this Court. As clarified in Booker, Watts was cabined specifically to the question of whether the practice of using acquitted conduct at sentencing was inconsistent with double jeopardy. We therefore turn to the New Jersey Constitution in our due process analysis.

C.

The New Jersey Constitution is a source of fundamental rights independent of the United States Constitution. See State v. Gilmore, 103 N.J. 508, 522-23 (1986) (holding that the New Jersey Constitution, independent of the United States Constitution, protected the right to a trial by jury by forbidding the exclusion of black jurors by use of peremptory challenges). The Federal Constitution provides the floor for constitutional protections, and our own Constitution affords greater protection for individual rights than its federal counterpart. Id. at 522-24, 45; see also State v. Carter, 247 N.J. 488,

35

529-30 (2021) (collecting cases and noting that this Court has found that our State Constitution offers greater protection than the Fourth Amendment from unreasonable searches and seizures "[o]n a number of occasions"); State v. Zuber, 227 N.J. 422, 438 (2017) ("As in other contexts, the State Constitution can offer greater protection in [the Eighth Amendment] area than the Federal Constitution commands."). The doctrine of fundamental fairness reflects the State Constitution's heightened protection of due process rights.

Article I, paragraph 1 of the New Jersey Constitution provides that

> [a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

"Despite the absence of the phrase due process in that paragraph, this Court has 'construed the expansive language of Article I, Paragraph 1 to embrace the fundamental guarantee of due process.'" Njango, 247 N.J. at 548 (quoting Jamgochian v. State Parole Bd., 196 N.J. 222, 239 (2008)). An important part of that due process guarantee is the doctrine of fundamental fairness.

Fundamental fairness is "often extrapolated from or implied in other constitutional guarantees." State v. Yoskowitz, 116 N.J. 679, 731 (1989). The doctrine "can be viewed as an integral part of the right to due process," State v. Abbati, 99 N.J. 418, 429 (1985), because it "serves to protect citizens

36

generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily," State v. Saavedra, 222 N.J. 39, 67 (2015) (quoting Doe v. Poritz, 142 N.J. 1, 108 (1995)).

This Court has applied the doctrine of fundamental fairness "'sparingly' and only where the 'interests involved are especially compelling'; if a defendant would be subject '"to oppression, harassment, or egregious deprivation,"' it is [to] be applied." Ibid. (quoting Doe, 142 N.J. at 108). The doctrine of fundamental fairness has been invoked in criminal cases "when the scope of a particular constitutional protection has not been extended to protect a defendant." Yoskowitz, 116 N.J. at 705. "Thus, even in circumstances not implicating violations of constitutional rights our courts have imposed limitations on governmental actions on grounds of fundamental fairness." State v. Cruz, 171 N.J. 419, 429 (2002); see also Njango, 247 N.J. at 537 (holding that fundamental fairness required that the excess time defendant erroneously served in prison be credited to reduce his parole supervision term under NERA); State v. Tropea, 78 N.J. 309, 315-16 (1978) (finding that a defendant's retrial on a motor vehicle speeding charge was barred by principles of fundamental fairness where the reversal of the defendant's earlier conviction was based on the State's failure to prove the applicable speed

37

limit); <u>Rodriguez v. Rosenblatt</u>, 58 N.J. 281, 294-96 (1971) (holding that indigent municipal court defendants facing charges that could result in a sentence of imprisonment or another "consequence of magnitude" must be granted the right to counsel based on principles of fundamental fairness).

The doctrine serves as "an augmentation of existing constitutional protections or as an independent source of protection against state action." <u>Doe</u>, 142 N.J. at 108 (quoting <u>State v. Ramseur</u>, 106 N.J. 123, 377 (1987) (Handler, J., dissenting)). Here, we apply the doctrine to consider whether acquitted conduct may be considered in sentencing defendants.

V.

Our Constitution's guarantee of the right to a criminal trial by jury is "inviolate." <u>N.J. Const.</u> art. I, ¶ 9. In order to protect that right, we cannot allow the finality of a jury's not-guilty verdict to be put into question. To permit the re-litigation of facts in a criminal case under the lower preponderance of the evidence standard would render the jury's role in the criminal justice process null and would be fundamentally unfair. In order to protect the integrity of our Constitution's right to a criminal trial by jury, we simply cannot allow a jury's verdict to be ignored through judicial fact-finding at sentencing. Such a practice defies the principles of due process and fundamental fairness.

38

Justice Scalia noted as much in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004). In <u>Blakely</u>, the United States Supreme Court refined <u>Apprendi</u> by clarifying what constituted the statutory maximum for sentencing purposes. <u>Id.</u> at 301-02. Although <u>Blakely</u> is thus tangential to our analysis, a hypothetical posed by Justice Scalia resonates strongly with the matters before this Court. In questioning critics of <u>Apprendi</u>, the Court challenged the idea that if a fact is labeled by the Legislature as a sentencing factor, it may be found by the judge no matter how much the punishment is increased as a result of the finding; in the Court's view, such a proposition would mean

> that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it -- or of making an illegal lane change while fleeing the death scene. Not even <u>Apprendi</u>'s critics would advocate this absurd result.
>
> [<u>Id.</u> at 306.]

Justice Scalia's hypothetical predicted the untenable situation in which Melvin finds himself. Melvin was convicted of second-degree unlawful possession of a weapon and acquitted of two counts of first-degree murder, second-degree possession of a weapon for an unlawful purpose, and second-degree aggravated assault. In other words, the jury determined that Melvin had a gun but acquitted him of all charges that involved <u>using</u> the gun -- or even having the purpose to use it unlawfully. Nevertheless, the trial court, in

39

applying aggravating factor six, found by a preponderance of the evidence that Melvin used the firearm "to shoot upon three other human beings." The absurd result that the Blakely hypothetical predicted came to be in Melvin's case.

The jury found Melvin guilty of unlawful possession of a handgun. The instructions for that offense explain that, to convict, the jury would have needed to find only the following elements beyond a reasonable doubt: "(1) That there was a handgun; (2) That the defendant knowingly possessed the handgun; and (3) That the defendant did not have a permit to possess such a weapon." Model Jury Charges (Criminal), "Unlawful Possession of a Handgun (Second Degree)" (N.J.S.A. 2C:39-5(b)) (rev. June 11, 2018). To convict Melvin of unlawful possession, the jury did not make any finding as to whether he used the handgun he possessed.

And in acquitting Melvin of any offenses that involved using the weapon -- or even of having had the "purpose to use the firearm unlawfully," see Model Jury Charges (Criminal), "Possession of a Firearm with a Purpose to Use it Unlawfully Against the Person or Property of Another" (N.J.S.A. 2C:39-4(a)) (rev. Oct. 22, 2018) -- the jury's verdict should have ensured that Melvin retained the presumption of innocence for any offenses of which he was acquitted. That the jury's verdict here served as "a mere preliminary to a

40

judicial inquisition into the facts of the crime that the State <u>actually</u> [sought] to punish," is an absurd and unfair result indeed. <u>See</u> <u>Blakely</u>, 542 U.S. at 306.

Although the facts in Paden-Battle's case are not as on point with the <u>Blakely</u> hypothetical as Melvin's case, the same absurdity presents itself in her matter. Paden-Battle was convicted of kidnapping, conspiracy to commit kidnapping, and felony murder. For the felony murder count, the trial court instructed that the "State does not contend that [Paden-Battle] killed Regina Baker by her own hand," but that "Regina Baker was shot and killed while [Paden-Battle], alone or . . . with one or more other persons[,] was engaged in the commission of or attempt or flight after committing the crime of kidnapping charged in Count 2 of the indictment." In finding Paden-Battle guilty of kidnapping, conspiracy to commit kidnapping, and felony murder, the jury's verdict reflected its conclusion, based on the evidence, that the victim's death would not have occurred without the commission of the kidnapping in which Paden-Battle was involved.

In finding Paden-Battle <u>not guilty</u> of the remaining offenses, however, the jury <u>rejected</u> the charges that Paden-Battle was guilty of first-degree murder or first-degree conspiracy to commit murder. Significantly, the jury was instructed that to convict Paden-Battle of conspiracy to commit murder, it would have to find

41

> 1. That [Paden-Battle] agreed with another person or persons that they or one or more of them would engage in conduct that constitutes the crime of murder; and
>
> 2. That the defendant's purpose was to promote or facilitate the commission of the crime of murder.

But the jury found that the evidence failed to establish one or both of those elements beyond a reasonable doubt and thereby restored the presumption of Paden-Battle's innocence as to the conspiracy charge.

Notwithstanding the jury's not-guilty verdict as to conspiracy to commit murder and murder, the trial court determined that Paden-Battle had in fact "orchestrated," "was the mastermind," "the supervisor," and "the driving force in this kidnapping and execution of Regina Baker." The trial court further noted that Paden-Battle was more culpable, and therefore deserving of a much longer sentence, than the individuals who pulled the trigger because of her "supervisory role over these co-defendants" and because "[s]he was in charge. Although she did not pull the trigger. They did so on her orders." For those reasons -- reasons that go to the heart of the conduct for which the jury returned a not guilty verdict -- the trial court sentenced Paden-Battle to sixty years in prison.

We hold that the findings of juries cannot be nullified through lower-standard fact findings at sentencing. The trial court, after presiding over a trial and hearing all the evidence, may well have a different view of the case than

42

the jury.  But once the jury has spoken through its verdict of acquittal, that verdict is final and unassailable.  The public's confidence in the criminal justice system and the rule of law is premised on that understanding. Fundamental fairness simply cannot let stand the perverse result of allowing in through the back door at sentencing conduct that the jury rejected at trial.

VI.

In both cases here, the sentencing court made clear its reliance on <u>Watts</u> in considering the acquitted conduct to enhance the sentences imposed on Melvin and Paden-Battle.  That reliance was a reasonable approach adopted by a number of other jurisdictions with regard to an issue that this Court had yet to consider.  Although we have found today -- as is true with regard to many constitutional issues -- that our State Constitution offers greater protection against the consideration of acquitted conduct in sentencing than does the Federal Constitution, the sentencing court's approach at the time was not unreasonable.

Both Melvin and Paden-Battle have requested that their matters be assigned to a different judge should this Court agree that resentencing is appropriate.  Again, we find that the trial judge's interpretation of <u>Watts</u> entirely logical and we have no doubt that on remand, the trial judge would adhere to this Court's ruling.  We do, however, believe that in this instance,

43

reassigning these matters is the best course when viewing the cases through the eyes of the defendants. In Melvin's case in particular, this will be the third time he is sentenced. He has already been paroled and will be appearing before the same judge for the third time on the issue of sentencing after yet another remand in his case. Viewing the proceedings from the defendant's perspective, it might be difficult to comprehend how the same judge who has twice sentenced him could arrive at a different determination at a third sentencing. Therefore, we order that both matters be reassigned on remand.

VII.

For the foregoing reasons, the judgment of the Appellate Division in State v. Melvin is reversed and the matter is remanded for resentencing. We affirm the judgment of the Appellate Division in State v. Paden-Battle that vacated the sentence and remanded for resentencing. The Essex County Assignment Judge shall reassign both cases on remand.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.